**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES *ex rel.* GERALDINE PETROWSKI, | ) ) ) |
| Plaintiff, | ) **Case No. 8:15-cv-01408-JSM-JSS** |
| v. | ) **Oral Argument Requested** |
| EPIC SYSTEMS CORPORATION, | ) **Dispositive Motion** |
| Defendant. | ) ) ) ) |

**DEFENDANT EPIC SYSTEMS CORPORATION'S MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT**

Defendant, Epic Systems Corporation ("Epic"), files this Motion to Dismiss and Incorporated Memorandum of Law in Support seeking dismissal of Geraldine Petrowski's (the "Relator") Second Amended Complaint (Dkt. 23) and states the following in support of its Motion:

## I.      INTRODUCTION

There is no interpretation of Relator's Second Amended Complaint that sets forth a proper claim under the False Claims Act ("FCA").  Just as the government declined to intervene, this Court should dismiss Relator's allegations.

Relator does not contest that Epic billing software generates compliant bills for submission of anesthesia claims to the Medicare program.  She alleges only that Epic software *could be* used in such a way that would allow its hospital customers to generate bills that cause the Medicare program to double pay for certain aspects of professional anesthesia services, apparently based on a misunderstanding of Medicare requirements for anesthesia claims submissions.  (Second Amended Comp., Dkt. 23, ¶ 17).  Relator concedes that she has no actual knowledge that any particular provider has used Epic billing software in such a way as to generate non-compliant bills that have been submitted to Medicare.  Thus, Relator engages in baseless and irresponsible speculation that it is "probable" that providers have incorrectly used Epic software.  (*Id.*).  Relator's speculations do not, and cannot, satisfy Federal Rules of Civil Procedure 8(a)(2) or 9(b).

***First***, Relator does not even allege that *any* claim was presented to a federal health program like Medicare for payment, as the FCA requires.  In fact, in her purported example claim (Exhibit B), the document is not a claim but instead an itemization of charges paid by Blue Cross, not Medicare.

**Second**, Exhibit B does not show what Relator claims it does.  Relator alleges in paragraph 19 that an "[unidentified] provider billed 28 units of CPT code 00865" citing to Exhibit B.  But neither 28 units nor CPT code 00865 appear anywhere on either Exhibit B or C (what she describes as the "Procedure Summary").

**Third**, Relator lacks sufficient knowledge—and the Second Amended Complaint contains no specific allegations—of how any given provider generates its claim forms to submit to Medicare; knowledge that her training at Epic and even her time at WakeMed cannot sufficiently address.

**Finally**, Relator's three separate counts allege violations of 31 U.S.C. § 3729 (a)(1)(A) (presentation of a false claim), § 3729 (a)(1)(B) (making a false record or statement material to a false claim), and § 3729 (a)(1)(G) (avoiding an obligation to pay the government).  Inexplicably, Relator uses the exact same words to support each of these three distinct violations, parroting the language of section 3729(a)(1)(A).  Under each count, she alleges Epic "made false representations about the software it provided."  (Dkt. 23, § VI, ¶ 2 (Count 1), ¶ 8 (Count II), ¶ 14 (Count III)).  Relator fails to allege **any** facts in support of that allegation; she never identifies any false representation that Epic made to anyone.  This type of recitation of statutory language, without more, does not meet the Rule 8(a)(2) pleading requirements.  Further, not only does Relator fail to identify any false representation for Count I, but she also omits *any* allegations in support of the statutory requirements for violations of §§ 3729 (a)(1)(B) and (G).

Accordingly, this Court should dismiss Relator's Second Amended Complaint.

2

## II.     BACKGROUND

### A.      <u>Statement of Facts</u>

#### 1.      Epic Systems Corporation

Epic offers an integrated suite of health care software that supports healthcare providers in their provision of patient care, including registration and scheduling, clinical systems for doctors, nurses, emergency personnel, and other health care providers, including systems for lab technologists, pharmacists, and radiologists.  Epic also offers billing systems that allow health care providers to generate bills that can be sent to private insurers and/or government health care program payers, including Medicare and Medicaid.

Relator's allegations pertain specifically to how anesthesia services performed by physicians or certified registered nurse anesthetists (CRNAs) are expressed in claims that are submitted to and paid by Medicare Part B.  Epic itself does not submit claims to Medicare (or any other government health care program payer, or even private insurers).

#### 2.      Relator's Allegations.

Relator alleges that she worked for WakeMed Health in North Carolina during the allegedly applicable changeover of the regulations controlling how claims are submitted to Medicare and Medicaid.  (*See* Dkt. 23, ¶¶ 9-13).  Relator claims to have been trained by Epic on its billing software at or around the time that it was implemented at WakeMed.  (*Id.* at ¶ 11).  While Relator makes vague allegations that the Epic billing software "allowed hospitals to set up their anesthesia billing modules" to purportedly double count "base units" (described below) in a manner that Relator alleges would generate non-compliant bills (*id.* at ¶ 13), she does *not* allege that WakeMed submitted any claims to Medicare using the Epic billing software that included base units.

3

Relator no longer works at WakeMed.  (*See id.* at ¶ 9).  And she has not included any allegation about her current employment status.  Yet, Relator points to documents and an "Anesthesia Bill" for services performed at another hospital, MD Anderson in Texas, as evidence of a "specific fraud perpetuated by Epic Systems Corporation."  (*Id.* at § V (capitalization removed)).  Relator alleges Exhibit B is that "Anesthesia Bill" which, in combination with a "Procedure Summary" in Exhibit C, purportedly shows that a bill was generated by an unidentified entity based on anesthesia services provided at MD Anderson and that bill would result in double counting seven base units associated with the applicable procedure.  (*See id.* at ¶¶ 18-19 & 21).  While unclear, Relator appears to allege that the purported double counting results from the Epic software including base units in the claim form even though those same base units will subsequently be applied by Novitas, the Medicare contractor for Texas.  (*Id.* at ¶¶ 19-21).

**B.**     **Medicare Billing Regulations for Anesthesia.**

The gist of Relator's allegations is that Epic billing software can be used to cause government payers to double count "base units" both as time units and separately as base units in calculating the reimbursement total for a claim.  These allegations are at odds with how Medicare calculates reimbursement for anesthesia, which we explain in this section.

**1.**     **Anesthesia Claims and Reimbursement**

The Center for Medicare and Medicaid Services ("CMS") pays for Medicare Part B anesthesia services based on "the product of the sum of allowable base and time units and an anesthesia-specific CF [conversion factor]."  42 C.F.R. § 414.46(b)(1).  Medicare calculates time units based on the time in minutes that is shown on the claim form and assigns base units based on the specific procedure code that is reported in the claim.  "Base unit" is defined as "the value for each anesthesia code that reflects all activities other than anesthesia time.  These activities

4

include usual preoperative and postoperative visits, the administration of fluids and blood

incident to anesthesia care, and monitoring services."  42 C.F.R. § 414.46(a)(1).  CMS annually

determines the base units for each anesthesia procedure code based on the specific procedure,

and informs the Medicare Administrative Contractors ("MAC") who process the claims.  *See* 42

C.F.R. § 414.46(b)(2).

   For purposes of determining the number of time units in the payment formula, "one

anesthesia time unit is equivalent to 15 minutes of anesthesia time, and fractions of a 15-minute

period are recognized as fractions of an anesthesia time unit."  42 C.F.R. § 414.46(c)(2).   For

example, a 63-minute procedure would equal 4.2 time units.  However, per the standard that

governs the electronic submission of health care claims, all claims for anesthesia reimbursement

must populate the data element or claim field to show *the actual time in minutes*, and the

Medicare Administrative Contractor ("MAC") "calculates the time units from the anesthesia

time reported by the anesthesia practitioner for the anesthesia procedure."  42 C.F.R.

§ 414.46(b)(1).

   At bottom, the "base units" (which have nothing to do with time) are added to the "time

units" and that sum is multiplied by a conversion factor to determine how much CMS will pay

for the anesthesia service.

## 2.  Data Elements of Claims Are Standardized Subject to HIPAA.

   The format and content of the claims transactions that are the subject of the Second

Amended Complaint take place within a regulatory context that applies to nearly all electronic

transactions, pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") of

1996.  HIPAA required the Secretary of the Department of Health and Human Services ("HHS")

QB\310265.00301\49886869.1

to adopt standards to support transactions between health care providers and health plans, including claims for payment that are the subject of Relator's allegations.

In January 2009, HHS adopted Version 5010 of the ASC X12N 837 as the standard that governs the electronic submission of health care claims, including those that are the subject of Relator's allegations.  (*See* Dkt. 23, ¶ 13 (referring to "the 5010 claim form")).  The Version 5010 required the time associated with anesthesia claims to be submitted exclusively in the form of minutes.  Thus, the Medicare Claims Processing Manual instructs those filing claims for anesthesia to "show the elapsed time (minutes) . . . [and] [c]onvert hours into minutes and enter the total minutes required for this procedure."  Chapter 26, ¶ 10.4 (last revised April 28, 2017).[1] As Relator implicitly recognizes, claims to Medicare for anesthesia services will only be accepted if the anesthesia time is reported in minutes: "Per Novitas Solutions, the Medicare contractor for Texas, . . . only '*the actual anesthesia time in minutes*' is reported on the claim form."  (*See* Dkt. 23, ¶ 19) (emphasis in original).

## III.   LEGAL STANDARDS

When ruling on a motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[N]aked assertions devoid of further factual enhancement" are not enough.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

Claims brought pursuant to the FCA must be pled with particularity under Federal Rule of Civil Procedure 9(b).  *See*, *e.g.*, *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) ("Particularity means that a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly

---

[1] The Medicare Claims Processing Manual can be found at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c26.pdf.

fraudulent acts, when they occurred, and who engaged in them.") (internal quotations omitted). The purposes behind the heightened pleading requirement of Rule 9(b) include: (a) to ensure that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of; (b) to "protect[] defendants from frivolous suits or spurious charges of immoral and fraudulent behavior"; (c) to eliminate fraud actions in which all the facts are learned after discovery; and (d) to protect defendants from harm to their goodwill and reputation. *See United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1314 n.24 (11th Cir. 2002). Adherence to Rule 9(b) requires a plaintiff to set forth precisely what statements were made in what documents, when, where and by whom, the content, the manner in which they misled the plaintiff, and what the defendants obtained as a consequence of the fraud. *See Ziemba v. Cascade Intern*, 256 F.3d 1194, 1202 (11th Cir. 2001).

In the absence of the relator identifying an actual false claim that was submitted to the government, a complaint must be dismissed under Rule 9(b) if it lacks adequate indicia of reliability that a false claim was submitted to the government. *Clausen*, 290 F.3d at 1311 (affirming district court's dismissal of FCA complaint where plaintiff did not provide any "indicia of reliability . . . in the complaint to support the allegation of an actual false claim for payment being made to the Government"); *McInteer*, 470 F.3d at 1359 (affirming district court's dismissal of FCA complaint where plaintiff "described in detail . . . an elaborate scheme for defrauding the government," including specific patients, dates, and medical records, but did not provide sufficient "indicia of reliability" that actual reimbursement claims were submitted).

Finally, as the Supreme Court has held, the pleading requirements under Rule 8(a)(2) can only be satisfied with facts, not "threadbare" assertions or legal conclusions. *Iqbal*, 556 U.S. at

678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

## IV.    ARGUMENT

### A.    All Three Counts Should be Dismissed Pursuant to Rule 9(b) for Failure to Plead the FCA Elements with Particularity.

Each of Relator's Counts in the Second Amended Complaint must be plead with particularity.  Because Relator failed to include such allegations, each of her three Counts must be dismissed pursuant to Rule 9(b).

Despite labeling each Count under a different section of the FCA, Relator parrots the language of 31 U.S.C. § 3729(a)(1)(A) for each Count, asserting that Epic purportedly "made false representations about [its] software" and "presented or caused to be presented, a false or fraudulent claim for payment . . ." "[a]s set forth above."  (Dkt. 23, § VI, ¶¶ 2 & 3 (Count I), ¶¶ 8 & 9 (Count II), ¶¶ 14 & 15 (Count III)).  Yet, there are no allegations "set forth above" of representations by Epic about its software, let alone misrepresentations to anesthesia providers or the government, nor credible allegations that *any* false or fraudulent claim was submitted to Medicare, let alone a claim presented or caused to be presented *by Epic* to Medicare.  Was the alleged misrepresentation oral or written?  What did it consist of? Who made the misrepresentation to whom, when, and where did it take place?  What was the claim allegedly submitted to Medicare?  How much money was the claim for?  By whom was it submitted? When was it submitted?  These questions cannot be answered based on Relator's allegations.

The Second Amended Complaint fails the most basic tests for Rule 9(b) particularity. *Clausen*, 290 F.3d at 1310 ("a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them.") (internal quotation omitted).  Relator's

attempts to fill these gaps are insufficient.  Relator's Exhibit B *detracts* from her allegations instead of supporting them.  Relator fails to show that she has sufficient knowledge to meet the Rule 9(b) requirements, and alleging a mere "probability" that providers can use Epic software to generate non-compliant claims, submit those claims, and receive payments in return, does not satisfy Rule 9(b).  Finally, Relator entirely overlooks necessary elements of claims pleading violations of 31 U.S.C. §§ 3729(a)(1)(B) & (G).

       **1.**      **Count I Should be Dismissed Because Relator Fails to Allege Facts Sufficient to Show that Epic Presented, or Caused to be Presented, a False or Fraudulent Claim.**

Relator labels Count I pursuant to 31 U.S.C. § 3729(a)(1)(A), the "presentment" clause. To state a claim under 31 U.S.C. § 3729(a)(1)(A), a plaintiff must allege: (1) a false or fraudulent claim; (2) which was presented or caused to be presented by the defendant to the United States for payment or approval; and (3) with the knowledge that the claim was false.  *See United States v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).  Relator makes the critical error of failing to sufficiently allege that a false claim was actually submitted to the United States for payment or approval.

       **a.**      **Exhibit B Contradicts Relator's Allegations.**

Not only does Relator's Exhibit B to the Second Amended Complaint *not* support her allegations, it actually contradicts them.  Relator's reliance on Exhibit B is a sufficient basis alone to dismiss Count I because it shows that the only alleged evidence Relator sets forth of a false claim does not show submission to Medicare, and it provides no support for Relator's calculations of purported double-billing.

9

### (1) *Exhibit B Does Not Support that Any Claim Was Submitted to the Federal Government for Anesthesia Services.*

The Second Amended Complaint does not allege or show that anyone, let alone an Epic customer, submitted a fraudulent claim was submitted to a federal health care program.  Relator relies on Exhibit B, an itemization of professional charges *paid by Blue Cross* for procedures performed at MD Anderson on June 14, 2016 (*see* Dkt. 23, ¶ 18; Dkt. 25), but, as Relator herself alleges, the "Medicare contractor for Texas, where M.D. Anderson is located," is Novitas Solutions, not Blue Cross, the payer listed in Exhibit B (Dkt. 23, ¶ 19).  Moreover, there is no mention of anesthesia services on Exhibit B.  Thus, while Relator's allegations pertain to Medicare billing and reimbursement policies for anesthesia services, the Second Amended Complaint contains no allegation or other information showing submission of a claim for anesthesia services to a federal health care program, let alone a claim that was false.  *See, e.g.*, *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 Fed. App'x 783, 798 (11th Cir. 2014) (affirming dismissal of complaint because plaintiff neither "discusses [n]or proffers a single false claim that was made to the Government in the detail required by *Clausen*, nor has he submitted a copy of such a bill or payment.  Instead, he proffers only conclusory assertions based on his own speculation that claims were submitted.").

### (2) *Exhibit B Does Not Support Relator's Calculations of Purported Double Counting of Base Units.*

Relator alleges Exhibit B shows that the "provider billed for 28 units of CPT code 00865" (Dkt. 23, ¶ 19), and then purports to contrast that with information provided in Exhibit C, an alleged anesthesia Procedure Summary.  Yet, Exhibit B does not show what Relator alleges and, in fact, is not even an anesthesia bill or claim for payment.  Exhibit B contains no reference to "CPT 00865" or "28 units."  (*See* Dkt. 25).   Instead, Exhibit B appears to be a document that

itemizes the receipt of payments from Blue Cross for surgical and pathology services without any apparent reference to anesthesia.  (*Id.*).  "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."  *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-CIV, 2012 WL 12844745, at *3 (S.D. Fla. Oct. 1, 2012) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)). Exhibit B does not support a plausible claim under the FCA.  *Griffin*, 496 F.3d at 1206.

Even more, the single claim purportedly shown in Exhibit B does *not* credibly exemplify the theory of fraud that Relator has alleged.  After alleging that the "the provider billed 28 units of CPT code 00865, which  . . . accounts for seven hours of billed anesthesia," Relator asserts that the Anesthesia Procedure Summary (Exhibit C) shows the total anesthesia time was only four hours and 49 minutes.  (Dkt. 23, ¶ 19).  The implication is that the anesthesiologist allegedly submitted a bill for seven hours of anesthesia time units when the correct time would have been much shorter.  Yet Relator does not bother to even allege the dollar amount of the claim ultimately submitted by MD Anderson (or the anesthesiologist) for payment by anyone, let alone a federal health care fund like Medicare.  Thus, there is no way to assess how, if at all, the "28 units" Relator claims exist on some Anesthesia Bill were taken into account in calculating the ultimate claim amount submitted for payment.

Relator never alleges, and Exhibit B does not contain a claim that shows, *any* claim for *any* amount of time entered in minutes—as required by Novitas, the Medicare contractor for Texas—was submitted.  (*See* Dkt. 23, ¶ 19 (alleging that Novitas looks for "the actual anesthesia time in minutes")).  There is no way to resolve the conflict between what Medicare claim submission regulations require – the reporting of *minutes* – and Relator's allegation that a claim

11

reporting *units* somehow resulted in an incorrect overpayment of an unspecified dollar amount by the Medicare program.

Moreover, Relator's description of Exhibit B as an example supporting her allegation that "[s]ome hospitals continue to bill with 15 minutes representing 1 unit" actually shows Relator's *lack* of specific knowledge about the submission of anesthesia claims. As addressed above, Medicare requires claims to report anesthesia time in minutes, not units. Thus, it is illogical to conclude that some hospitals would continue to submit bills to Medicare in units of time.

Relator relies on Exhibit B as her example of a false claim for anesthesia services that was purportedly presented to the federal government for payment. "As the Eleventh Circuit has repeatedly stated, **the submission of a claim is the *sine qua non* of a False Claims Act violation**." *United States v. LifePath Hospice, Inc.*, No. 8:10-CV-1061-T-30TGW, 2016 WL 5239863, at *6 (Moody, J) (M.D. Fla. Sept. 22, 2016) (emphasis added; quotations omitted); *see also Atkins*, 470 F.3d at 1359 (affirming dismissal with prejudice of complaint where relator was a "psychiatrist responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement"). However, Exhibit B neither shows a false claim nor presentment to Medicare (nor even charges for anesthesia services or that the anesthesia provider is an Epic customer). As such, Relator's reliance on Exhibit B is misplaced and Count I must be dismissed for failure to sufficiently allege necessary elements of 31 U.S.C. § 3729(a)(1)(A).

> **b.  Relator Has Not Asserted Adequate Indicia of Reliability That a False Claim was Submitted to the Government.**

Relator's attempt to show that Exhibit B, a purported false claim, was submitted to Medicare fails for the reasons set forth above. Nor is Relator able to allege adequate indicia of reliability to infer that an actual false claim was submitted to Medicare. *Clausen*, 290 F.3d at

1311.  As this Court has made clear, "because liability under the FCA attaches not to underlying fraudulent activity, but to the submission to the government of *a claim for payment*, the claims submitted to the government or the statements supporting those claims **must be pled with particularity**."  *LifePath Hospice*, 2016 WL 5239863, at *6 (second emphasis added).

Relator's training on the Epic billing software is insufficient to inform how other providers use the Epic billing software—including MD Anderson—and Relator fails to allege that her former employer, WakeMed actually submitted any false claims using its Epic billing software.  Nor has Relator pleaded any specific knowledge of MD Anderson, its procedures, its billing software, or even that any claim, let alone a false one, was actually submitted by MD Anderson to the government using the Epic billing software.  Finally, Relator's inference based on circumstantial evidence that other providers "probably" use Epic billing software to submit false claims to the government is insufficient to meet the pleading standard.

In *Clausen*, the relator, one of the defendant's competitors, alleged that the defendant medical testing corporation (LabCorp) billed the government for unnecessary laboratory tests in its long-term care facilities ("LTCF").  290 F.3d at 1303.  The relator's operative complaint included patient lists, a blank health-insurance claim form, and specific medical test codes.  *Id*. at 1306.  The relator then described how certain examples of improper testing "would have been identified on Form 1500s, including additional references to specific medical test codes," and then submitted as a claim to the government.  *Id*. at 1306.  The court held that "[a]t most, [the relator's] complaints raise questions about LabCorp's internal testing policies," but he "failed to identify a single claim that was *actually submitted* pursuant to the allegedly fraudulent schemes identified." *Id.* at 1312; 1313 (emphasis added).  And, as this Court recognized, "the court in *Clausen* noted the difficulty of meeting Rule 9's heightened pleading requirement, especially for

a corporate outsider, like Clausen, who does not have ready access to actual claims or first-hand knowledge of billing practices." *LifePath Hospice, Inc.*, 2016 WL 5239863, at *7. Accordingly, the *Clausen* court affirmed the dismissal with prejudice, "finding that neither the FCA nor the Federal Rules provide a pleading leniency for those without personal knowledge." *Id.* (citing *Clausen*, 290 F.3d at 1314).

> ### (1)   *Relator's Training by and Documents from Epic Do Not Elevate Relator's Knowledge to an Adequate Level of Specificity.*

Here, Relator is a corporate outsider. She does not allege any expertise in software development. While she attempts to rely upon the training she received at Epic during her time with WakeMed to allege that the Epic software might "allow" hospitals to use their versions of the software in a non-compliant way (*see* Dkt. 23, ¶ 13), Relator has not pled any facts showing she had any specific knowledge related to the submission, or creation, of the specific claim at issue in this matter (Exhibit B). Broken down, Relator's allegations amount to no more than an assertion that the Epic software ***theoretically*** could have been used to lead to "influencing" of incorrect billing, not that the software ***actually*** was used to follow non-compliant billing practices, or that Epic knew about such a possibility. Relator makes no allegation regarding when, where, or to whom Epic made a "material omission of fact" that purportedly "led to influencing the fraudulent billing to Medicare and Medicaid." *See Hopper v. Solvay Pharms.*, 588 F.3d 1318, 1327 (11th Cir. 2009).

Indeed, the Second Amended Complaint makes clear that Relator has no actual knowledge of how any provider actually used its Epic billing software. She makes general allegations based on her time at WakeMed about how, in her view, Epic's software was inappropriately designed, but she provides no real facts about how any provider actually used its software. Not only did Relator leave WakeMed three and a half years ago (a year before she

14

filed her initial complaint) such that she cannot allege that she even knows how WakeMed

*currently* uses its Epic billing software, but Relator does not allege that WakeMed ever used the

Epic billing software to generate and submit false claims to Medicare.

Exhibits D and E—documents allegedly distributed to Epic customers—fare no better.

According to Relator, these exhibits indicate "that base units should be included for claim

processing," (Exhibit D) and that "the base units are built into the pricing for the claims."

(Exhibit E)  (Dkt. 23, ¶ 21).  These generic statements are ambiguous even in the context of

Relator's allegations, because base units *are* built into the pricing of claims and base units *are*

part of the Medicare reimbursement formula for anesthesia services.  Relator makes no attempt

to explain how these statements support her contention that Epic systems are being used to

generate inaccurate claims to a federal health care program, or that MD Anderson's system was

used to generate a bill for anesthesia services that resulted in an incorrect payment for anesthesia

services.

### (2) *Relator Has Not Alleged Sufficient Knowledge of MD Anderson's Software or Billing Protocols.*

Despite her reliance on Exhibits B and C, documents purportedly from MD Anderson,

Relator alleges no specific knowledge of MD Anderson's implementation of the Epic billing

software.  Because Relator has no knowledge of MD Anderson's billing protocols, she does not

and cannot allege that the supposed excessive base units for anesthesia were the result of MD

Anderson's use of the Epic billing software.  Nor has she shown that any specific (allegedly)

false claim generated at MD Anderson by the Epic billing software was ultimately submitted to

Medicare, or even that a bill for anesthesia services was generated by MD Anderson at all (as

opposed to a third-party anesthesiologist).

Relator cannot be permitted to manufacture FCA claims based on vague allegations from her time at WakeMed, who she notably does not allege submitted any false claims to Medicare using its Epic billing software.  Nor can she go forward on documents that affirmatively do *not* show *any* claim was submitted to the government for payment, let alone a false claim, from a hospital with which Relator has no apparent affiliation and does not plead specific knowledge.

### c.      An Alleged "Probability" that a False Claim Was Submitted is Not Enough to Satisfy Rule 9(b).

Relator's lack of knowledge of any other provider's Epic system leads her to conclude candidly that it is only "probable" that most of Epic's customers are using its billing software to purportedly generate bills that result in double payment for the base units associate with anesthesia procedures.  (Dkt. 23, ¶ 17; *see also* ¶ 13 (Epic billing software "*allowed* hospitals to set up their anesthesia billing modules to include the sum of the actual time, plus the base unit time to be reported on the claim form.") (emphasis added)).  These inferences are insufficient.  In *Clausen*, the court explained that Rule 9(b) "does not permit [an FCA] plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."  290 F.3d at 1311. Here, Relator does not even describe a private scheme in detail.

*Corsello v. Lincare, Inc.* also is instructive.  428 F.3d 1008, 1013 (11th Cir. 2005). There, the court found relator's "aware[ness] of the manner by which the defendants submitted fraudulent claims" insufficient to satisfy Rule 9(b).  The court also explained: "Because it is the submission of a fraudulent claim that gives rise to liability under the [FCA], that submission must be pleaded with particularity and not inferred from the circumstances."  *Id*. at 1013; s*ee also McInteer*, 470 F.3d at 1359 ("[Relator] fails to provide the next link in the FCA liability

16

chain:  showing that the defendants actually submitted reimbursement claims for the services he describes.  Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.").  Here, Relator does not even allege that any false claims "were likely submitted."  The mere probability that providers might be submitting false claims through the use of Epic billing software, is insufficient under Rule 9(b) and demonstrates that Relator in fact does not know if any false claims were submitted to the government.

For all of the reasons set forth above, Relator fails to meet the pleading requirements for Counts I and thus those Counts should be dismissed.

**2.      Relator Misses the Mark on Count II Because She Fails to Allege Materiality.**

Count II should be dismissed because Relator fails to allege materiality.  Count II is labeled 31 U.S.C. § 3729(a)(1)(B), which creates liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement ***material*** to a false or fraudulent claim."  *Id*. (emphasis added).  Relator does not meet the elements of what is commonly referred to as the "make or use" provision.

Not only does Relator fail to identify any false statement or record knowingly made or used by Epic, but she also omits any allegation in support of the statutory requirement that the statement or record at issue be *material* to a false claim.  *United States ex rel. Sharpe v. Americare Ambulance*, No. 8:13-CV-1171-T-33AEP, 2017 WL 2840574, at *7 (M.D. Fla. July 3, 2017) (dismissing alleged violation of section 3729(a)(1)(B) because "[t]he Complaint fails to identify what 'false record or statement' is at issue and why the statement was 'material' to a false claim."); *Rutledge v. Aveda*, 2:14-CV-00145-AKK, 2015 WL 2238786, at *9 (N.D. Ala. May 12, 2015) (dismissing § 3729(a)(1)(B) claim because relator did not "allege that violations

of federal regulations generally, or even violations of the regulations specifically mentioned in the [Program Participation Agreement at issue], would be material to the government's decision to pay."). For example, Relator acknowledges that Medicare claims for anesthesia services are paid based on a submission of the anesthesia time in minutes (Dkt. 23, ¶ 13), and thus the only element that is material for purposes of calculating the time component is the reported time in minutes. Nevertheless, Relator never alleges that the Epic billing software, or any provider using it, misstated the number of minutes of anesthesia time on a claim to Medicare.

**3.      Count III Fails to Make Any Allegation that Epic Failed to Pay Money it Owed to the Government.**

Count III should also be dismissed. Despite Relator parroting the language of 31 U.S.C. § 3729(a)(1)(A), Count III is labeled 31 U.S.C. § 3729(a)(1)(G), which is commonly referred to as the "reverse false claim" provision. Section 3729(a)(1)(G) creates liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an ***obligation*** to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an ***obligation*** to pay or transmit money or property to the Government." *Id.* (emphasis added). "To sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012). Relator fails to even allege, let alone identify, any obligation that Epic, or any provider using Epic billing software, had to pay or return money to the government. As such, Count III should be dismissed. *United States ex rel. George v. Fresenius Med. Care Holdings, Inc.,* No. 2:12-CV-877-AKK, 2014 WL 12607797, at *6 (N.D. Ala. Mar. 31, 2014).

**B.**     **Each Count Should be Dismissed Because Relator Fails to Allege Facts Sufficient to Plead a Claim Pursuant to Rule 8(a)(2).**

As the Supreme Court has held, the pleading requirements under Rule 8(a)(2) can only be satisfied with facts, not "threadbare" assertions or legal conclusions. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Rather than pleading facts, from which one could reasonably infer that Epic took actions that satisfy the elements of the FCA, resulting in claims that were false on account of Epic's reckless disregard or knowledge, Relator simply parrots the language of 31 U.S.C. § 3729(a)(1)(A) in each of her Counts. This sort of verbatim recitation of the statute is nothing more than a legal conclusion and does not suffice under Rule 8(a)(2). *See Iqbal*, 556 U.S. at 680-81, 686-87 (allegation that petitioner "knew of" misconduct failed Rule 8(a)(2)'s pleading standard even under "general" pleading standards).

As noted above, the Second Amended Complaint mechanically reincorporates "each of the preceding paragraphs" of factual allegations (*see* Dkt. 23, § VI, ¶ 1 (Count I), ¶ 7 (Count II), ¶ 13 (Count III)), and every count states twice, "[a]s set forth above" (*see id* at § VI, ¶¶ 2-3 (Count I), ¶¶ 8-9 (Count II), ¶¶ 14-15 (Count III)). This "shotgun pleading" fails "to give [Epic] adequate notice of the claims against [it] and the grounds upon which each claim rests." *Omanwa v. Catoosa Cty., Georgia*, No. 17-11041, 2017 WL 4535856, at *4 (11th Cir. Oct. 11, 2017) (citations omitted). Because "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief" dismissal is appropriate on this additional, independent basis. *Id.* (citations omitted).

Even when Relator ventures beyond the mere words of the statute, the linchpin of her allegations that she "has firsthand knowledge of Defendant's Epic software which has been provided to various hospitals which incorrectly bills anesthesia charges," turns out to be untrue.

(Dkt. 23, ¶ 10).  Relator has no firsthand knowledge of how any provider used its Epic billing system, other than the one she worked for, WakeMed, several years before bringing this Second Amended Complaint.  And her allegations about what transpired at WakeMed while she was there are very general.  Thus, her allegation that it is "probable that most of [Epic's] software customers . . .  are using [Epic's] billing software as written to double bill anesthesia" is pure speculation. (Dkt. 23, ¶ 17).

Without actual knowledge of how MD Anderson, or any other provider, used its Epic billing software, her allegation that providers are submitting false claims as a result of the way they used their Epic billing software is also speculation.  She has no grounds for even predicting the probability that they used their systems to incorrectly charge the government for "hundreds of millions of dollars in fraudulent bills for anesthesia services."  (Dkt. 23, ¶ 21).  Plausible claims are not based on pure speculation, and Relator's Second Amended Complaint should be dismissed under Rule 8(a)(2).  *Pena v. New Horizons Computer Learning Ctr. of Miami*, No. 12-21476-CIV, 2013 WL 12152422, at *3 (S.D. Fla. Apr. 16, 2013) (dismissing complaint because it "is devoid of factual allegations, commingles claims, and does not contain 'a short and plain statement of the claim showing that [Plaintiff] is entitled to relief.'  Fed. R. Civ. P. 8(a)(2).");  *Rutledge* 2015 WL 2238786, at *10 ("Knowledge is not shown by simply saying . . . that Defendants are saying something that is not true.").

## V.   CONCLUSION

For the reasons stated above, Epic respectfully requests that Relator's Second Amended Complaint be dismissed in its entirety without leave to amend.

Respectfully submitted this 19th day of
December 2017.

s/ John M. Guard

John M. Guard
Florida Bar No. 374600
**QUARLES & BRADY LLP**
101 East Kennedy Blvd., Suite 3400
Tampa, FL 33602-5195
(813) 387-0300 (phone)
(813) 387-1800 (facsimile)
John.Guard@quarles.com

Martha Jahn Snyder (*pro hac*)
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI  53703
(608) 251-5000 (pone)
(608) 294-4992 (facsímile)
martha.snyder@quarles.com

David W. O'Brien (*pro hac*)
Barbara H. Ryland (*pro hac*)
Rochelle Rosenberg (*pro hac*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
202-624-2850 (phone)
202-628-5116 (facsimile)
E-mail:  dobrien@crowell.com
E-mail:  bryland@crowell.com
E-mail:  rrosenberg@crowell.com

*Attorneys for Epic Systems Corp.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of December, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record, including:

Christopher Emden, Assistant United States Attorney

David Linesch, Attorney for the Relator

s/ John M. Guard

1